# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| LEN SHAKESPEARE, | ‖ | |
| Plaintiff, | ‖ | No. C05-0120 |
| vs. | ‖ | **ORDER** |
| JO ANNE B. BARNHART,<br>Commissioner of Social Security, | ‖ | |
| Defendant. | ‖ | |

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## I. PROCEDURAL BACKGROUND

Plaintiff Len Shakespeare applied for Title XVIII and Title II benefits on October 3, 2001, alleging an inability to work since August 6, 2000 (Tr. 41-43). His application was denied (Tr. 31-34), and denied again on reconsideration (Tr. 36-38). A hearing before Administrative Law Judge ("ALJ") Thomas M. Donahue was held on July 21, 2004 (Tr. 267-99). In an Opinion dated September 23, 2004, the ALJ denied benefits (Tr. 15-20). On May 12, 2005, the Appeals Council denied the plaintiff's request for review (Tr. 6-9). This action for judicial review was timely filed on July 12, 2005.

## II. FACTUAL BACKGROUND

### A. Medical History

The plaintiff was born on August 10, 1970 and has a high school education (Tr. 41, 57). Mr. Shakespeare applied for benefits based on these symptoms: "vertigo, dizziness,

1

loss of balance, headaches, Tinnitus, confusion, muscle tightness with pain, blurry vision and a black jagged line seen in field of vision" (Tr. 51). The plaintiff has past relevant work as a sanitary landfill operator, grain elevator clerk, security guard, commercial cleaner, brush painter, bagger, and hand packager (Tr. 109).

Dr. Thomas Grabowski, a University of Iowa Hospitals and Clinics ("UIHC") neurologist, wrote a letter to Dr. Lamorgese on January 27, 1995, concerning his evaluation of Mr. Shakespeare (Tr. 110). Dr. Grabowski made the following observations of the plaintiff who complained of pain stemming from a work injury while employed as a janitor:

> The problems developed gradually . . . [t]he shaking of the right shoulder developed after a few days and he was referred to a chiropractor. He has noticed that while walking or driving he is 'unable to see right.'

(Tr. 110). Dr. Grabowski reported that a subsequent MRI scan indicated that Mr. Shakespeare's bulging discs did "not appear" to be "clinically significant" (Tr. 110). Dr. Grabowski opined as follows: "I believe [the plaintiff] has had primarily a soft tissue (possibly strain) injury and I would recommend physical therapy for the purpose of prescription of neck strengthening exercises and I would urge as rapid a return to the work place as possible." (Tr. 110).

Dr. Andrew Peterson of the Iowa Physician's Clinic prepared a general "To Whom It May Concern" letter on February 4, 1998 describing his treatment of Mr. Shakespeare over multiple visits (Tr. 112). Dr. Peterson noted that initial evaluations of Mr. Shakespeare's symptoms (i.e., neck pain, headaches, atypical muscle spells) failed to demonstrate a clear etiology (Tr. 112). Dr. Peterson ultimately opined that (1) Mr. Shakespeare does not suffer from epileptic seizures; (2) an incidental finding of an arachnoid cyst in the left temporal lobe revealed during a CT head scan was asymptomatic; and (3) all symptoms seemed to resolve themselves upon successful treatment of musculoskeletal pain with physical therapy (Tr. 112-13).

The plaintiff was seen by Dr. Donald Linder in the St. Luke's Hospital Emergency Room on January 5, 2000, complaining that his ears had been ringing for approximately one week (Tr. 114). Dr. Linder diagnosed the plaintiff with tinnitus and upper respiratory congestion and prescribed Sudafed in addition to continuing the plaintiff's Cefzil (Tr. 114).

Dr. Mary Susan Pruzinsky of Iowa Physicians' Clinic wrote a letter to Dr. Miller on January 18, 2000, concerning her evaluation Mr. Shakespeare's "two-week history of tinnitus in the left ear" (Tr. 115). Upon physical examination, Dr. Pruzkinsky found both TM's to be intact and mobile while the audiogram showed "a mild sensorineural hearing loss in both ears in the high frequencies, slightly worse in the right ear than the left" (Tr. 115). Dr. Pruzinsky recorded the plaintiff's assessment and plan, in relevant part, as follows:

> History of recent vertigo which has resolved with persistent two-week history of left ear tinnitus. The [plaintiff] had stated that he'd had an MRI scan done a few years ago for a work-up for possible seizure disorder. . . . It is possible . . . that a small intracanalicular acoustic neuroma could be missed on the [MRI] scan. . . . What I would recommend at this point because it is such a high out-of-pocket expense for [the plaintiff] is to wait another six months or so. If he has ongoing persistent unilateral tinnitus or any recurrent dysequilibrium or vertigo by that time, I would recommend an MRI scan to rule out the possibility of a small intracanalicular acoustic neuroma.

(Tr. 115-16).

On March 16, 2000, Dr. Paul Schneider performed an MRI of Mr. Shakespeare's brain at St. Luke's Hospital (Tr. 151-52). The test results indicated that there was a stable arachnoid cyst in the left middle cranial fossa that remained unchanged from Mr. Shakespeare's initial 1995 study (Tr. 151). Dr. Schneider concluded that no new masses developed and that the MRI was negative for "cerebellopontine angle masses" (Tr. 152).

On April 25, 2000, Mr. Shakespeare saw physical therapist Ms. Mary Shepherd at UIHC for a re-evaluation pursuant to an initial visit eight weeks earlier (Tr. 137). Although exercises were prescribed during his initial visit, Mr. Shakespeare stopped the exercises because they induced dizziness, nausea, and neck pain (Tr. 137). Ms. Shepherd scheduled a repeat audiogram and considered vestibular neuronitis with poor compensation as a clinical diagnosis (Tr. 137).

The plaintiff was seen at the St. Luke's Hospital Emergency Room by Dr. Matthew Reid on May 9, 2000, complaining of vertigo (Tr. 118). The plaintiff described feeling that "at times life is 'being sucked out of him,'" and that he gets hot/sweaty and then suddenly becomes ice cold (Tr. 118). The plaintiff also complained of some chest pain and that he occasionally "wants to cough" (Tr. 118). The physical and neurological exams conducted were normal (Tr. 118). Dr. Reid's diagnostic impression of the plaintiff consisted of ongoing tinnitus and vertigo, chest wall spasm, and pain (Tr. 118). Dr. Reid's plan of treatment included Ibuprofen, Antivert, and reassurance (Tr. 118). Dr. Reid noted that the plaintiff was to follow up with Dr. Miller at UIHC with any ongoing problems (Tr. 118).

On May 31, 2000, Mr. Shakespeare again visited St. Luke's ER and was seen by Dr. Craig Hovda, this time complaining of dizziness (Tr. 119). The plaintiff stated that he had been suffering from vertigo, nausea, and tinnitus for approximately six months (Tr. 119). Dr. Hovda reported that the physical exam was normal and found no evidence of any gross neurological defects, but Dr. Hovda did admit that he did not thoroughly examine the patient at triage (Tr. 119). He opined that there was a possible psychiatric component to the plaintiff's condition and that Mr. Shakespeare's symptoms probably did not relate to carbon monoxide exposure from work (Tr. 119). Dr. Hovda recorded his plan for Mr. Shakespeare's treatment as follows:

> I spoke at length with [the plaintiff] including talking about the possibility that he needs to see a psychiatrist. He did not believe this but nonetheless I told him to follow up with Dr. Miller to renew his previous work.

(Tr. 119).

On September 13, 2000, Dr. Michael Wagoner of UIHC wrote a letter to Dr. David Puk pursuant to an evaluation of persistent right eye discomfort following a May, 2000 corneal injury (Tr. 135). Upon examination, Dr. Wagoner found "multiple areas of punctate epitheliopathy in the superotemporal quadrant" suspected to be limbal herpes epithelial keratitis (Tr. 135). Dr. Wagoner had the impression that Mr. Shakespeare suffered from either a recurrent erosion syndrom or HSV epithelial keratitis induced by the trauma of his injury (Tr. 135). To cover both possible diagnoses, Dr. Wagoner prescribed Acylovir for two weeks and a topical solution regimen for six weeks (Tr. 135). Mr. Shakespeare was to follow up with Dr. Puk (Tr. 135).

On November 10, 2000, Dr. Burstain evaluated outpatient Mr. Shakespeare at UIHC for complaints of vertigo (Tr. 133-34). Mr. Shakespeare claimed that he developed vertigo after a chiropractor "severely wrench[ed] his neck" and Dr. Burstain reported that prior tests (i.e., MRI, electronystagmogram) were normal or inconclusive (Tr. 133). Dr. Burstain was concerned about "the possibility of vertebral or basilar tear/clot/aneurysm or cerebellar disease" and scheduled a blood screen and MRA as follow-up (Tr. 133).

Mr. Shakespeare visited Dr. Todd Burstain as an outpatient again on December 12, 2000 complaining of vertigo (Tr. 130). Given the normal MRA and unremarkable physical examination results, Dr. Burstain reported the possibility of a seizure-type disorder and planned to see Mr. Shakespeare after Dr. Gantz in Otology conducted further tests (Tr. 130).

On January 3, 2001, Dr. John Chaloupka, UIHC Director of Interventional Neuroradiology, wrote a consultation memorandum concerning his evaluation of Mr. Shakespeare upon Dr. Kardon's referral (Tr. 127-29). Mr. Shakespeare complained of intermittent vertigo, left-sided tennitus, and left ocular pain (Tr. 127). Dr. Chaloupka examined the available UIHC case file which included prior MRI and MRA test results (Tr. 128). Upon physical examination, Mr. Shakespeare appeared normal (Tr. 128). Dr. Chaloupka determined that Mr. Shakespeare's "peculiar constellation of symptoms may be difficult to attribute to a single pathoetiologic mechanism" but may stem from a "dural arteriovenus fistula of the cavernous sinus" (Tr. 128). Dr. Chaloupka recommended that Mr. Shakespeare undergo a diagnostic catheter angiogram to rule out the possibility of a dural arteriovenus fistula (Tr. 128). Endovascular surgery may be required if such a fistula is positively diagnosed (Tr. 128).

UIHC Drs. Emily Greenlee and Randy Kardon wrote a letter to Dr. Miller on April 25, 2001, concerning their evaluation of Mr. Shakespeare in the Neuro-Ophthalmology Clinic on April 19, 2001 (Tr. 120). The doctors reported in the recent medical history portion of their letter that Mr. Shakespeare's carotid angiogram performed in January of 2001 was negative for a fistula (Tr. 120). Mr. Shakespeare continued to complain of headaches, chronic tinnitus, and cloudy vision with a "central vertical black streak in the right eye" (Tr. 120). The doctors stated their impression that Mr. Shakespeare presents "no evidence by MRI, MRA or arteriogram of an arteriovenous fistula" (Tr. 121, 125-26). Despite contentions of Mr. Shakespeare and his family, Drs. Greenlee and Kardon "do not feel that [Mr. Shakespeare's] symptoms are secondary to carbon monoxide exposure [from the recycling plant where he worked], since they are intermittent and occur long after his presumed exposure" (Tr. 121). Mr. Shakespeare was instructed to follow up as needed (Tr. 121).

On May 5, 2001, Dr. Guy O'Connor saw Mr. Shakespeare in the St. Luke's Hospital ER, complaining of chronic headache, vertigo, and chest pain (Tr. 138). Mr. Shakespeare reported that past ER visits determined that he has a "ripped joint in his chest" (Tr. 138). Dr. O'Connor's physical and neurological exam of Mr. Shakespeare were normal (Tr. 138). The following additional lab tests conducted were also normal: CT Scan of the head; chest x-ray; EKG; and CBC & chemistry panel (Tr. 138-41). Mr. Shakespeare was discharged and urged to follow up with his treating physician if symptoms persist (Tr. 138).

On June 11, 2001, Mr. Shakespeare underwent a psychiatric consultation at UIHC where Drs. Amos and Grosdidier noted that Mr. Shakespeare appeared to hear "perfectly" despite continued tinnitus and suffer from a depression that did not require specific therapy (Tr. 160). The doctors further described Mr. Shakespeare's judgment, insight, attention span, concentration, and memory to be fair (Tr. 163). The determination was made that Mr. Shakespeare should seek psychotherapy close to home, but no further specialty tested was needed (Tr. 164). In their impression, Drs. Amos and Grosdidier believed Mr. Shakespeare to suffer from Somatization NOS in addition to Vertigo and Tinnitus and gave plaintiff a GAF score of 55 (Tr. 163-64).

Dr. Ronald Miller of Integra Health saw Mr. Shakespeare twelve times between September of 1998 and November of 2001 due to complaints of tinnitus and musculoskeletal discomfort (Tr. 143-45). In a progress note dated January 10, 2000, Dr. Miller reported that Mr. Shakespeare had difficulties sleeping due to tinnitus but "does not want to take any medication for this" (Tr. 144). Also, Dr. Miller noted on October 2, 2000, that Mr. Shakespeare relates many symptoms to working at a recycling plant where he suffered an eye injury from glass (Tr. 144). Physical and neurological exams conducted were normal (Tr. 143-45).

On October 5, 2001, Mr. Shakespeare met with Dr. Burstain at UIHC as an outpatient for follow-up of his central vertigo (Tr. 157). Mr. Shakespeare did not tolerate the medication Neurontin, which gave him strange color-change sensations, but Dr. Burstain's physical exam of Mr. Shakespeare was normal (Tr. 157). Dr. Burstain reported that he would wait for the next audiogram results to be returned before deciding on a further treatment course (Tr. 157).

On November 8, 2001, Dr. Russel Warner, a neuro-opthamalogist with UIHC, sent a letter to Dr. Miller after consulting with Mr. Shakespeare on November 2, 2001 (Tr. 153). In addition to chronic vertigo and oscillopsia, Mr. Shakespeare reported color photopsias on the right side without headaches[1] (Tr. 153). Dr. Warner determined that a prior medication prescribed by Dr. Burstain called Gabapentin might have precipitated the photopsias, so Dr. Warner urged Mr. Shakespeare not to take the medication, decrease caffeine intake, and to get adequate sleep (Tr. 153). An examination of Mr. Shakespeare's eyes determined that his visual acuity remained 20/20 in both and that his "[o]cular motility was full with no nystagmus" (Tr. 153).

Dr. Deema Fattal saw Mr. Shakespeare as an outpatient at UIHC on February 5, 2002 for an evaluation of dizziness (Tr. 201-03). Mr. Shakespeare stated that his dizziness caused lightheadedness, spinning, and a general lack of balance (Tr. 201). Dr. Fattal recounted how past medical exams for Mr. Shakespeare's symptoms had been stable[2] (Tr. 201). Dr. Fattal indicated that Mr. Shakespeare suffers from other complicating factors as well, including "adjustment mood and sleep difficulty, chronic headaches, and chronic cervical muscle spasm" (Tr. 202). Dr. Fattal decided to give Mr. Shakespeare a

_____

[1]Mr. Shakespeare specifically reported intermittent flickering of multi-color lights in his right peripheral vision (Tr. 153).

[2]Dr. Fattal enumerated the following tests performed on Mr. Shakespeare as having normal results: brain MRI; audiograms; ENG; ocular motor exam; nystagmus exam; cervical spine MRI; neuro-opthamological exam; thyroid exam; CBC; chemistry profile; and ESR (Tr. 201).

botulinum injection and nortriptyline to help with sleep (Tr. 202). Further, Dr. Fattal scheduled Mr. Shakespeare for vestibulo-ocular reflex dysfunction ("VOR") assessment and offered a referral for vesitublar rehabilitation (Tr. 202). Dr. Fattal instructed Mr. Shakespeare to do Brandt-Daroff exercises and return for follow-up in one month (Tr. 202).

On March 13, 2002, Dr. John Stokes of UIHC sent a letter to Dr. Fattal regarding his evaluation of Mr. Shakespeare for hypertension two days earlier (Tr. 180-83). Mr. Shakespeare attributes his hypertension to other persistent symptoms (i.e., tinnitus, positional vertigo, headache, etc.) that have been ongoing for approximately three years (Tr. 180). After reviewing Mr. Shakespeare's past medical history and conducting a physical examination, Dr. Stokes determined as follows: (1) blood pressure seems to be under control; (2) positional exercises would likely help with positional vertigo and should be continued if the patient wants to be functional again, despite the nausea and dizziness that may accompany the exercises; (3) losing weight is imperative because obesity complicates medical conditions; (4) follow-up visits are in order for further assessment due to Mr. Shakespeare's many symptoms of unclear etiology, but vertigo requires immediate attention; and (5) Mr. Shakespeare may suffer from renal tubular acidosis given his "urine pH of 7 and a serum CO2 of 20" (Tr. 181).

On April 27, 2002, Dr. Deema Fattal saw Mr. Shakespeare as an outpatient at UIHC complaining of dizziness, headaches, and mood swings (Tr. 184). Dr. Fattal reported that past posturography/oculo-motor testing came back normal and that the notriptyline medication seemed to help Mr. Shakespeare sleep (Tr. 184). Dr. Fattal concluded that Mr. Shakespeare suffered from VOR and adjustment mood disorder (Tr. 184). He suggested that Mr. Shakespeare begin vestibular/cardiopulmonary exercises and made a referral to the hypertension clinic for an evaluation of high blood pressure (Tr. 184).

On April 29, 2002, Mr. Shakespeare visited Dr. Fattal as an outpatient at UIHC complaining of chronic dizziness and loss of balance (Tr. 178-79). In light of his symptoms, Mr. Shakespeare reported that he felt extremely depressed and contemplated suicide (Tr. 178). Dr. Fattal strongly urged Mr. Shakespeare to seek psychiatric help, recommended the medication Celexa to help with mood difficulties, and requested that Mr. Shakespeare return for a follow-up appointment in three months (Tr. 178).

On May 1, 2002, Dr. Robert Hammer, a licensed psychologist, conducted a mental evaluation of Mr. Shakespeare at the request of the DDS (Tr. 204-07). Mr. Shakespeare complained of tinnitus, vertigo, headaches, right eye difficulties, imbalance, sleeplessness, and a loss of his sense of direction, but denied any history of family illness (Tr. 204-05). Tests showed that Mr. Shakespeare's memory was in tact, but he did have trouble concentrating and was able to repeat "only 1/3 items on 5-minute delayed recall" (Tr. 205). Mr. Shakespeare indicated that his "sense of balance can change 'by the minute'" and that both his memory and concentration have been adversely affected (Tr. 206). Dr. Hammer diagnosed Mr. Shakespeare with depressive disorder, NOS, gave claimant a GAF score of 60, and provided the following mental RFC:

> He will clearly have some difficulty in maintaining attention and concentration. He should be able to understand instructions but will have difficulty in remembering the assignments or directions. He should be able to interact appropriately with Supervisors, co-workers and the public, although his physical limitations and the required accommodations he would need, may make it difficult for them to accept him. He should be able to exercise adequate judgment and respond appropriately to minor changes in the work setting or work routine.

(Tr. 206).

On May 31, 2002, Dr. Burstain saw Mr. Shakespeare at UIHC as an outpatient for follow-up care (Tr. 208). Mr. Shakespeare complained that he felt worse when doing the exercises prescribed by Dr. Fattal (Tr. 208). Due to Mr. Shakespeare's persistent visual

and vestibular symptoms, Dr. Burstain correlated the problems with a medial longitudinal fasiculus (Tr. 208). Mr. Shakespeare was instructed to continue follow-up with Neurology, but Dr. Burstain offered no specific treatment regimen (Tr. 208).

On June 26, 2002, Dr. Rhonda Lovell, a psychologist and medical consultant for the DDS, reviewed Mr. Shakespeare's medical records (Tr. 228). Dr. Lovell found that the medical record partially supports Mr. Shakespeare's allegations but Mr. Shakespeare does not exhibit a mental disorder that rises to the level of a listed impairment (Tr. 228). Ultimately, Dr. Lovell determined that Mr. Shakespeare's "depressive disorder would result in no more than moderate impairment in his ability to sustain a reasonable pace and complete a typical work week," an assessment consistent with that of Dr. Hammer (Tr. 228).

On July 1, 2002, Dr. Claude Koons determined that Mr. Shakespeare "continues to be capable of the RFC[3] dated 1/10/02" (Tr. 229).

Dr. John Stokes sent a letter to Dr. Fattal on August 8, 2002 concerning Dr. Stoke's follow-up examination of Mr. Shakespeare at the UIHC Renal Hypertension Clinic six days earlier (Tr. 242-45). In addition to hypertension, Dr. Stokes considered the following conditions: positional vertigo of uncertain etiology; possible prior work exposure to an undefined toxin; arthritis of uncertain etiology; headaches; and pain in the chest, abdomen, back, arms, and legs (Tr. 242). Mr. Shakespeare complained that his daily activities are extremely limited and that he cannot drive a car because of the constant dizzy spells and associated symptoms (Tr. 242). Dr. Stokes concluded that Mr. Shakespeare's blood pressure is well controlled but, due to the absence of etiology for dizziness and associated pains, he referred Mr. Shakespeare to the Internal Medicine department for "long-term followup" (Tr. 243).

---

[3]Note that this 1/10/2002 RFC referenced generally by Dr. Koons is not available in the medical records provided.

On September 17, 2002, Mr. Shakespeare visited Dr. Burstain as an outpatient at UIHC complaining of vertigo and visual disturbances (Tr. 238). Given the "fairly extensive workup" that has thus far been negative, Dr. Burstain felt "at a loss . . . how to explain [Mr. Shakespeare's] constellation of symptoms, other than maybe somatization/generalized anxiety disorder" (Tr. 238). Dr. Burstain provided a referral to the UIHC Seizure Clinic (Tr. 238).

UIHC Dr. Ana Recober prepared a letter to Dr. Burstain on October 31, 2002 regarding her follow-up examination of Mr. Shakespeare on October 28, 2002 for chronic dizziness (Tr. 236). Dr. Recober indicated that past medications (i.e., Gabapentin, Tegretol, and Meclizine) did not help while chiropractic treatment seemed to help initially, but was not curative (Tr. 236). Mr. Shakespeare stated that he felt frustrated about his symptoms and was previously diagnosed with a somatization disorder by a psychiatrist (Tr. 236). Dr. Recober suggested follow-up care with a psychologist and urged that Mr. Shakespeare continue to refrain from driving while suffering from dizzy spells of unknown etiology (Tr. 236). Dr. Recober recommended that Mr. Shakespeare be admitted for three days to undergo video/EEG monitoring to rule out epilepsy as a possible diagnosis (Tr. 236).

On November 27, 2002, Mr. Shakespeare underwent an MRA of the head and neck at UIHC (Tr. 235). The test appeared normal and displayed no evidence of vertebral dissection or occlusion (Tr. 235). The test did confirm an incidental finding of an arachnoid cyst consistent with earlier studies (Tr. 235).

On March 21, 2003, Dr. Burstain saw Mr. Shakespeare as an outpatient at UIHC for complaints of occasional persthesias in the hands, neck discomfort, and muscle tension in the upper back and shoulders (Tr. 260). A low dosage of Lisinopril has kept Mr. Shakespeare's blood pressure within normal range (Tr. 260). Dr. Burstain suggested that Mr. Shakespeare apply heat and try some over-the-counter, non-steroidal medication for the muscle pain and discomfort (Tr. 260). Dr. Burstain offered no further treatment

at the time and scheduled Mr. Shakespeare for a follow-up appointment in three to four months (Tr. 260).

On August 26, 2003, Dr. Burstain saw Mr. Shakespeare as an outpatient at UIHC for complaints of headache and chest discomfort associated with chronic symptoms (i.e., vertigo, hearing difficulties, etc.) (Tr. 258). The subsequent physical exam was normal and Dr. Burstain considered the possibility of a central nervous system problem and scheduled an MRI of the brain/spine (Tr. 258). Dr. Burstain urged Mr. Shakespeare to watch his diet and follow-up in two months (Tr. 258).

On October 8, 2003, Dr. Burstain saw Mr. Shakespeare again to follow-up on atypical neurological symptoms despite the fact that a recent C-spine MRI and CNS "were negative for any signs of any spino cerebellar degenerative disease" (Tr. 254-57). Mr. Shakespeare complained of migraines for which past medications (i.e., Imitrex) did not help (Tr. 254). Dr. Burstain prescribed a trial course of Amerge in the interim, scheduled a follow-up appointment in three to four months, and decided not to conduct any further tests (Tr. 254).

On March 9, 2004, Mr. Shakespeare visited Dr. Burstain who determined that the extensive workup of vestibular and opthalmic symptoms of unclear etiology leave open three possibilities: (1) an undiagnosed neurologic disorder; (2) a conversion reaction; or (3) malingering (Tr. 248). Dr. Burstain decided not to pursue further testing and scheduled Mr. Shakespeare for a follow-up appointment in four months (Tr. 248).

On March 10, 2003, Mr. Shakespeare was admitted to UIHC for video/EEG monitoring (Tr. 250). The Discharge Summary completed by Dr. Fattal on March 11, 2003 indicated that seizures are not responsible for Mr. Shakespeare's dizziness and visual changes (Tr. 251). The full day of monitoring recorded a typical dizzy episode, but showed no EEG change whatsoever (Tr. 252). "From the neuro-otology point of view, his prior extensive evaluation was consistent with non-neurological causes/adjustment disorder." (Tr. 251). Dr. Fattal recounted how Mr. Shakespeare never underwent a

complete ENG test because he could not tolerate the exam and also suggested that a referral to the Occupational Exposure Clinic may be prudent given Mr. Shakespeare's insistence that his symptoms derived from exposure to work-related toxins (Tr. 251).

A Level II neuropsychological assessment was also performed on Mr. Shakespeare at the request of Dr. Erik St. Louis, the report of which noted that any mental distress likely centers on physical symptoms (Tr. 253). Actual cognitive functioning during the test "reflected only modest inefficiency . . . in the context of limited effort" and it is difficult to discern whether Mr. Shakespeare suffers any actual brain dysfunction effecting memory or processing speed (Tr. 253). However, these findings do not necessarily "rule out 'organic' etiologies" of Mr. Shakespeare's complaints and a referral to the Neuropsychological Rehabilitation Lab was provided for claimed distress in light of his "significant somatic concern" (Tr. 253).

## B. Plaintiff's Subjective Complaints

Mr. Shakespeare completed a Daily Activities Questionnaire on November 10, 2001 (Tr. 72-75). He claims to live with his mother and perform all self-care needs, but has difficulties maintaining a regular shower schedule due to dizziness (Tr. 72). Mr. Shakespeare claims that dizziness and a loud noise in his head prevent him from getting a full night's rest and make it difficult to lie down or to stay still (Tr. 72). He claims that he always requires help/supervision to complete chores because he is forgetful[4] and often cannot complete a task because he becomes too physically weak (Tr. 72). Mr. Shakespeare relies on his mother to prepare most meals and never shops or runs errands unassisted (Tr. 73). Mr. Shakespeare has a valid driver's license and occasionally drives under supervision, but claims that he no longer possesses any sense of direction and gets easily confused in unfamiliar surroundings (Tr. 73). Mr. Shakespeare further claims

---

[4]Mr. Shakespeare insists that he must constantly be reminded to perform chores such as feeding the dog or putting water out for the geese and, at times, to take medications (Tr. 73).

that he can no longer perform certain regular activities that he used to enjoy (i.e., working on cars, fishing, riding bikes, or walking on trails) because the dizziness adversely affects his concentration/memory (Tr. 74).

He watches television and listens to the radio, but claims not to read anymore in light of concentration problems and poor vision (Tr. 74). Mr. Shakespeare does not report any difficulties going out in public and visits with friends/relatives provided that he is not "too dizzy" (Tr. 74). Although he claims to rarely get socially involved, Mr. Shakespeare has no problems getting along with others or accepting criticism and got along "very well" with past employers/colleagues with whom he still keeps in touch (Tr. 74). Mr. Shakespeare does claim that he reacts "badly" to stress or adjusting to changes which can make him confused (Tr. 75). Mr. Shakespeare also contends that he cannot follow directions because of his poor memory/concentration and cannot pay bills or manage money (Tr. 75). At the same time, Mr. Shakespeare admits that he is not seeking treatment for his conditions (Tr. 75).

On November 5, 2001, Mr. Shakespeare completed a Personal Pain/Fatigue Questionnaire wherein he claimed to suffer from incapacitating headaches, severe tinnitus,[5] pain in the arms, legs, chest, and right eye, poor vision, dizziness, as well as vestibular damage (Tr. 76-77). Movement, weather changes, air pressure and stress worsen these conditions (Tr. 76). According to Mr. Shakespeare, any medications, caffeine, or tiredness can also affect the pain and he cannot maintain his balance in the dark (Tr. 76). He claims that the pain is present at all times, but varies in degree (Tr. 76). Mr. Shakespeare further contends that his pain and dizziness are so pronounced on occasion that he cannot walk and must crawl on the floor (Tr. 77). He notes that the pain has worsened with time and that past medications (i.e., Meclizine, Gabapentin) have had

---

[5] Mr. Shakespeare states that UIHC rates his Tinnitus at 88%, one of the more severe cases encountered (Tr. 76).

little effect or exacerbated the symptoms[6] (Tr. 78). Mr. Shakespeare reports that UIHC Drs. Burstain and Kardon diagnosed him with irreparable nerve damage which causes the pain, dizziness, and tinnitus (Tr. 78).

Mr. Shakespeare claims that these physical conditions severely limit his ability to concentrate, hear, and move (Tr. 78). He claims that he no longer can do the following: drive a car much, shop alone, fix cars, run, take trail walks, read, or go out with friends (Tr. 78). Mr. Shakespeare states that he cannot sleep, manage finances, or bend/stoop when dizzy, and also has gained weight (Tr. 79). Depending on the severity of the dizziness that Mr. Shakespeare encounters on a daily basis, he will do nothing beyond small tasks like taking care of his dog or feeding the geese on the premises (Tr. 80).

On May 2, 2002, Mr. Shakespeare completed a secondary Personal Pain/Fatigue Questionnaire in which he expressed how the dizziness, headaches and pain have become so overwhelming that he "just want[s] to die" (Tr. 90). His headache pain is still constant, worsens with movement, and causes drowsiness (Tr. 90). Mr. Shakespeare claims that he does not take any pain medications because he does not wish to worsen his "already damaged vestibular system" and he is not currently seeing any physicians (Tr. 91-92). Vertigo continues to prevent Mr. Shakespeare from performing past activities (i.e., reading car manuals and restoring vehicles, etc.) (Tr. 92). He further claims he cannot walk/stand for too long and no longer has the desire to take care of personal needs (i.e., showering, changing clothes) on a daily basis (Tr. 92).

Mr. Shakespeare completed another Daily Activities Questionnaire on May 6, 2002 (Tr. 94-99). He claims to have difficulties sleeping, but takes no naps during the day and regularly mows the lawn, rakes leaves, and takes out trash (95). Mr. Shakespeare states that he is unable to drive due to vertigo and is accompanied by his mother when venturing outside the home (Tr. 96). Mr. Shakespeare claims that he does take medications but

---

[6]Additionally, Mr. Shakespeare claims that even those alternative remedies like the physician-suggested vestibular exercises do not help relieve the pain (Tr. 78).

affirms that there are no side effects (Tr. 97).  He further states that he does not read "anything anymore because of the black line that runs through [his] eye" (Tr. 97).  Mr. Shakespeare states that he has no difficulties going out in public and visits his grandmother once weekly, but does not participate in any social groups or activities (Tr. 97-98).  Mr. Shakespeare cites that his problems with concentration and focus make it hard to follow directions and that he continues to see the same doctors (Tr. 99).

### C.  Hearing Testimony

Mr. Shakespeare was born on August 2, 1970 and completed the 12th grade, but has no further academic or professional training (Tr. 271).  Past employment includes: recycling monitor at a landfill; lab assistant for grain-hauling trucks; security guard; automotive repair technician; office/factory cleaner; cart corraler at Sam's Club; and assembly line worker (Tr. 271-77).  Mr. Shakespeare testified that he last worked at the waste management facility on August 6, 2000 when he was asked to leave for unknown reasons (Tr. 277).  He claimed that "it had something to do with [him] getting sick" in light of alleged carbon monoxide exposure (Tr. 277).  Mr. Shakespeare testified that the noxious fumes caused dizziness, vertigo, and vomiting[7] (Tr. 278).  Mr. Shakespeare further testified that current persistent symptoms of dizziness and vertigo can be traced back to a single incident when he came home from work ill one day, passed out, and could not walk for four days thereafter (Tr. 278).

Mr. Shakespeare testified in detail as to further symptoms that he experiences on a chronic basis: tinnitus, right eye difficulties after sustaining a work injury with glass, spells of confusion, and migraines (Tr. 279).  Current medications include Lisinopril and a multi-vitamin, but Mr. Shakespeare reported that he cannot tolerate suppressants due to a damaged vestibular system which affects hearing as well as the ability to walk (Tr. 279).  Mr. Shakespeare testified that he suffers attacks of vertigo daily and tries to perform

---

[7]Mr. Shakespeare further noted that other workers, too, suffered from similar symptoms while working at the recycling plant (Tr. 278).

prescribed vestibular exercises at least once a week, but admits that he does not do them consistently (Tr. 281, 286). Movement and suppressant medications worsen the vertigo symptoms (Tr. 281). When experiencing sustained vertigo episodes, Mr. Shakespeare testified that the "only thing [he] can do is sit in a chair in the corner and listen to the radio" while he coughs and gags intermittently (Tr. 282, 285).

He testified that noise from the tinnitus on the left side is at 88% as determined by medical specialists and at times gets so bad that he can hear nothing else (Tr. 282-83). When his tinnitus reaches this peak, which happens on occasion, he must "actually look at people's faces and [] kind of read their lips" (Tr. 283). Mr. Shakespeare further claimed that he always feels as though he has a headache, but perhaps only once a year will experience a severe migraine with extreme sensitivity to light (Tr. 284). Although he can walk and bend, Mr. Shakespeare claimed that traversing irregular surfaces "stir up" his symptoms and make him nauseous (Tr. 285). During a confusion spell, which he claimed to experience constantly like the migraines, Mr. Shakespeare says things that are out of character and notices that one pupil appears dilated (Tr. 288). Furthermore, Mr. Shakespeare testified that his symptoms cause difficulties with sleep and when they are "bad," he doesn't "even attempt to go to bed" (Tr. 286). Mr. Shakespeare further claimed that his chores are limited to mowing the lawn and tending to the geese (Tr. 287, 294). He testified that he cannot mow the lawn in a single session and that his symptoms (i.e., vertigo, etc.) force him to take breaks or risk injury to his property[8] or himself (Tr. 287).

---

[8]Mr. Shakespeare reported that on at least one occasion, he "mowed off one of [his] fruit trees" while attempting to mow the lawn because he felt disoriented with vertigo (Tr. 287).

Aside from a family friend that visits with Mr. Shakespeare daily, he claimed to have no social life (Tr. 289). Mr. Shakespeare testified that his symptoms prevent him from performing his favorite hobby (i.e., fixing up classic automobiles) any longer despite attempts to take it up again (Tr. 290). Mr. Shakespeare testified that he constantly stumbles and bumps into things which he believes stems from vertigo-induced, faulty depth perception (Tr. 291). Mr. Shakespeare reported that Dr. Burstain referred him to a psychiatrist who told Mr. Shakespeare that "there was nothing he could do" for the reported symptoms and that there was no indication of mental illness (i.e., manic depression) (Tr. 291).

Mr. Shakespeare testified that he cannot work at present because he is unreliable, doctors urge him not to drive, and that no one will hire him with the host of symptoms that he exhibits daily (Tr. 291-92). Mr. Shakespeare testified that he does not drive for the most part, but admitted to driving "once every two months when we go to the dump" (Tr. 292-93).

### III.  CONCLUSIONS OF LAW

#### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial

evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

## B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." <u>Frankl v. Shalala</u>, 47 F.3d 935, 937 (8th Cir. 1995) (citing <u>Reed v. Sullivan</u>, 988 F.2d 812, 815 (8th Cir. 1993)).  If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience.  <u>Id.</u>

Under the first step of the analysis, the ALJ found that Mr. Shakespeare had not engaged in substantial gainful activity since his alleged onset date (Tr. 16).  At the second step, the ALJ determined that the combination of Mr. Shakespeare's physical and mental impairments constitute severe impairments (Tr.16).  At the third step, the ALJ determined that Mr. Shakespeare's impairments do not meet or equal one of the listed impairments (Tr. 17).  At the fourth step, the ALJ determined that Mr. Shakespeare remains capable of performing past relevant work (Tr. 19).  At the fifth step, the ALJ determined that Mr. Shakespeare has the residual functional capacity to perform past relevant work and, even if unable to do so, can still perform certain unskilled work available in the national economy and therefore was not disabled (Tr. 19).

C.  Mental Impairments

Mr. Shakespeare argues that the ALJ improperly found his depression to be non-severe in light of certain medical opinions to the contrary.  The Commissioner argues that Mr. Shakespeare misconstrues the context of the word "severe."  The ALJ recognized that Mr. Shakespeare's depression does not rise to meet the listing level of severity.  An impairment does not qualify as severe under the Social Security Act unless it "significantly limits [one's] physical or mental ability to do basic work activities" (i.e., understanding and executing simple instructions, using judgment, responding appropriately to co-workers, etc.).  <u>See</u> 20 C.F.R. § 404.1521(b).

"[D]etermining whether an individual's impairment reaches listing level is not an issue in which the opinion of a treating source is given controlling weight." Randolph v. Barnhart, 386 F.3d 835, 840 (8th. Cir. 2004) (citing 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2)). In fact, such treating source opinions "on issues reserved to the Commissioner will never be given controlling weight." Soc. Sec. Ruling 96-5p. The Eighth Circuit Court of appeals has maintained that the absence of any evidence of consistent counseling or psychiatric treatment "disfavors a finding of disability." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)). A plaintiff's failure to seek consistent medical treatment for alleged impairments lessens the credibility of subjective complaints of mental disability. See Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996) (citing Wingert v. Bowen, 894 F.2d 296, 299 (8th Cir. 1990)).

Dr. Fattal determined that Mr. Shakespeare suffered from adjustment mood disorder (Tr. 184, 202). Consulting psychologist Dr. Hammer diagnosed Mr. Shakespeare with a depressive disorder and a GAF score of 60 (Tr. 206). The record also indicates that Drs. Hovda and Miller mentioned that a psychiatric component might be involved. However, the ALJ noted that neither has Mr. Shakespeare ever sought treatment for depression or a related adjustment disorder nor does he take an anti-depressant. Mr. Shakespeare, as claimant, must carry the burden of offering medical evidence to prove that he is disabled under the Act's standards. See 20 C.F.R. § 404.1512. The ALJ properly considered the plaintiff's failure to allege depression as a basis for disability benefits or testify as to mental limitations at the administrative hearing. After all, the ALJ has "no [affirmative] obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989)). Furthermore, Mr. Shakespeare incorrectly asserted that DDS consulting psychologist Dr. Lovell found Mr. Shakespeare to suffer from a "severe"

mental impairment. In fact, Dr. Lovell found Mr. Shakespeare to exhibit a serious mental disorder that did not rise to the level of a listed impairment (Tr. 228). And with regard to Dr. Hammer's conclusion, the opinion of a consulting medical expert "who examines a claimant once does not [alone] constitute substantial evidence." Metz v. Shalala, 49 F.3d 374, 378 (8th Cir. 1995) (citing Hancock v. Secretary, 603 F.2d 739, 730 (8th Cir. 1979)).

The ALJ acted within his discretion by according greater weight to state agency medical consultants, i.e., Dr. Lovell, who opined that Mr. Sahkespeare's mental impairments do not meet the severe listing level so as to preclude employment. The ALJ has the right to consider opinions of state agency medical consultants because they are not just physicians, but also experts in the field of Social Security law. See 20 C.F.R. § 404.1527(f)(2).

In concluding that Mr. Shakespeare failed to exhibit a "severe" mental impairment in accordance with C.F.R. listing standards, the ALJ also made a proper credibility determination.

### D. Credibility Determination

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. However, subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1321-22.

Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). An ALJ is permitted to factor in the claimant's demeanor upon personal observation as part of a complete credibility assessment. See id. at 1147-48. Evidence of poor prior work performance may be considered as an additional relevant factor. See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (noting that low wages and gaps in employment may "cast doubt on [] complaints of disabling pain"). The exaggeration of symptoms is another element to be weighed in evaluating a plaintiff's subjective complaints of pain. See Jenkins v. Brown, 861 F.2d 1083, 1086.

In evaluating Mr. Shakespeare's credibility, the ALJ fulfilled his obligation to make express credibility determinations and to set forth the inconsistencies in the record which caused him to reject the subjective complaints. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th. Cir. 2004). The ALJ need only acknowledge and consider the Polaski factors before discounting a claimant's subjective complaints. Id. The court finds ample inconsistencies in the record as a whole to support the ALJ's credibility determination in this matter. The ALJ specifically enumerated several indicia that weaken the credibility of Mr. Shakespeare's subjective allegations.

The claimant did not have any visible signs of mental distress or demonstrate difficulties concentrating at the hearing. Evidence of a poor work history[9] may support little motivation on Mr. Shakespeare's part. Certain exercises prescribed on multiple occasions seemed to help alleviate vertigo symptoms somewhat by Mr. Shakespeare's own admission, but he consistently failed to follow through with the exercises as instructed. Dr. Stokes even stressed to Mr. Shakespeare that a continued exercise regimen was imperative. Mr. Shakespeare claimed to perform all self-care needs himself. And despite

---

[9]Between 1985 and the alleged disability date in 2000, Mr. Shakespeare earned between $0.00 and $11,447.33 annually (Tr. 49).

claims of debilitating confusion spells and constant stumbling, most all objective medical evidence proved to be normal or clinically insignificant. Extensive neurological and physical tests conducted over the course of the alleged disability period include, but are not limited to, the following: (1) multiple MRIs; (2) MRA; (3) electronystagmogram; (4) CT head scan; (5) chest x-ray; (6) EKG; (7) CBC & chem. panel; (8) audiogram; (9) blood screen for toxins such as arsenic, lead, and mercury; as well as (10) video EEG monitoring.

The aforementioned battery of tests conclusively determined that Mr. Shakespeare did not suffer from a seizure disorder, ateriovenus fistula, intracanlicular acoustic neuroma, cerebellum disease, or vertebral tear/clot/aneurysm. Mr. Shakespeare and his family members often insisted that his symptoms stem from prior work exposure to toxins (i.e., carbon monoxide), but blood screens ruled that out as a possibility too. In his second Pain/Fatigue Questionnaire completed on May 2, 2002, Mr. Shakespeare even admitted that he did not want to take any medications and that he was not currently seeing any doctors for his several symptoms. Despite claims of debilitating tinnitus, on at least three occasions during the relevant medical period Mr. Shakespeare demonstrated near perfect word recognition scores during general hearing evaluations (Tr. 160, 167, 186). And despite claims of serious eye difficulties pursuant to a corneal injury, Mr. Shakespeare retained 20/20 vision in both eyes on more than one occasion and had normal exams at other times (Tr. 120,148, 153, 251).

The ALJ also considered the daily activities cited by Mr. Shakespeare as inconsistent with his alleged disabilities. Mr. Shakespeare continues to drive an automobile at times and spend the bulk of his days working on "projects" like fixing lawn mowers with a family friend. The physical exertion and/or concentration required to carry out such tasks stand in stark contrast to the alleged severity of eye problems, vertigo, and accompanying symptoms that would preclude Mr. Shakespeare from working. Mr. Shakespeare also claimed to care for his pets, stroll through the family orchard, and

socialize with friends. Furthermore, the ALJ points to the limited effort Mr. Shakespeare put forth during one particular neurological assessment which lends credence to Dr. Burstain's later diagnosis of the plaintiff as a potential malingerer.

Additionally, the ALJ properly designated the "relevant" medical period as that time between the alleged onset of disability date (August 6, 2000) and December 31, 2003 because the Eighth Circuit has made it clear that "[w]hen an individual is no longer insured for Title II disability purposes, we will only consider an individual's medical condition as of the date []he was last insured." Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (citing Bastian v. Schweiker, 712 F.2d 1278, 1280 (8th Cir. 1983)). Plaintiff contends that one of the most telling tests, the ENG, proved inconclusive because he became nauseous and could not complete the exam. Importantly, that ENG was performed on February 15, 2000, over six months before the relevant medical period. Along the same lines, current medical records containing tests performed after the relevant period elapsed are not helpful in determining Mr. Shakespeare's disability before December 31, 2003.

### E. Full and Fair Evaluation of the Record

The plaintiff claims that he did not receive a full and fair evaluation of his record based on the ALJ's failure to seek clarification or additional evidence of vertigo or a possible somatoform disorder. Mr. Shakespeare takes issue with the ALJ's contention that most all objective evidence was normal and requests that the case be remanded and a new psychiatric consult take place to consider somatoform. The Commissioner argues that the record offers substantial medical evidence to determine whether Mr. Shakespeare is disabled and, therefore, further testing is not warranted.

The ALJ is duty bound to "develop the record fairly and fully," Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). "[E]vidence developed in an administrative hearing must be fully and impartially evaluated and resolved to meet the ends of justice, not molded to fit the predisposition of the factfinder." Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991). In so doing, ALJs and other similar quasi-judicial administrative officers

are presumed to be unbiased. <u>Schweiker v. McClure</u>, 456 U.S. 188, 195 (1982); <u>Isom v. Schweiker</u>, 711 F.2d 88, 90 (8th Cir. 1983) (citing <u>Withrow v. Larkin</u>, 421 U.S. 35, 57 (1975)). In a social security disability hearing, the ALJ "is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" <u>Goff v. Barnhart</u>, 421 F.3d 785, 791 (8th Cir. 2005) (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)). Inadequate, unclear, and incomplete medical evidence or the use of unacceptable laboratory/clinical techniques would create such an undeveloped issue crucial to a complete evaluation. <u>Goff</u>, 421 F.3d at 791 (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)). However, an ALJ may disregard a physician's opinion without seeking clarification or requesting further tests when such opinions are merely "inconsistent with other substantial evidence." <u>Goff</u>, 421 F.3d at 791. The ALJ need only order additional tests or alternate exams if "sufficient medical evidence" does not exist to help make an informed decision as to the claimant's disability status. <u>See</u> <u>Conley v. Bowen</u>, 781 F.2d 143 (8th Cir. 1986).

Mr. Shakespeare argues that he suffers from clear neurological deficits associated with VOR. Specifically, plaintiff contends that the ALJ ignored or failed to understand the implications of certain tests (i.e., 2002 sensory organization test results where Mr. Shakespeare became dizzy and a report by Dr. Fattal in February of that year describing plaintiff's difficulties with the Romberg coordination test). With regard to Dr. Fattal's report (Tr. 201-03) which suggested VOR, a review of the physician's complete analysis shows that there were Romberg abnormalities, but Mr. Shakespeare displayed both normal coordination and ocular motor testing and was "negative" for Romberg overall on that same day (Tr. 202). The vast majority of all medical tests described as normal Mr. Shakespeare's gait, coordination, ability to communicate, hearing, and vision too. Even if the aforementioned two incidents of objective evidence cited by Mr. Shakespeare constituted substantial evidence, a reversal is not warranted

"merely because substantial evidence would have supported an opposite conclusion." Peña v. Chater, 76 F.3d 906, 908 (8th. Cir. 1996).

Mr. Shakespeare's argument is weakened by the fact that he draws medical conclusions that remain unsubstantiated by the treating physicians or consultants themselves. Plaintiff explains the extent of vestibular damage in general terms using on-line and other reference sources and fails to demonstrate specific medical evidence in the record to bolster such claims. See 20 C.F.R. § 404.1508 (noting that disability determinations must be grounded in acceptable medical evidence in the record, not generalizations). The record as a whole supports the ALJ's conclusion that Mr. Shakespeare did not suffer any significant limitation outside of vertigo, a symptom that did not itself rise to the level of a listed impairment. The fact that neither Dr. Burstain nor Dr. Fattal, both of whom saw Mr. Shakespeare over time, imposed significant restrictions or indicated that Mr. Shakespeare suffers from a debilitating illness that would altogether preclude employment tends to support an ALJ finding that claimant is not disabled under the Act. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000).

The ALJ did not accord less weight to the opinions of certain physicians because of unclear, incomplete, or unacceptable medical records and tests. Rather, the ALJ discounted those opinions that were not substantiated with record evidence on the whole. Neither the Commissioner's regulations nor applicable case law require a duty of the ALJ to order further exams under such circumstances.

Mr. Shakespeare further argues that Dr. Hammer performed an incomplete psychological consultation in failing to review all available medical records of somatoform. Specifically, plaintiff argues that Dr. Hammer failed to consider these relevant psychiatric determinations occurring after Dr. Hammer's May, 2002 evaluation: (1) Dr. Burstain's September, 2002 report which was "at a loss" to explain claimant's symptoms; (2) Dr. St. Louis' September, 2002 report referencing a past somatization diagnosis; (3) the March, 2003 neuropsychological assessment citing a "significant somatic concern";

and (4) Dr. Burstain's March, 2004 report discussing the possibility of a similar conversion disorder. Because a somatoform disorder entails "physical symptoms for which there are no demonstrable organic or known physiological mechanisms," 20 C.F.R. § 404, Subpt. P, App. 1, § 12.07, it is extremely difficult to diagnose without a complete review of all medical records.

Dr. Burstain's 2004 reference to a potential conversion order falls outside the scope of the relevant medical period and therefore need not be considered. Still, this court does not believe that Dr. Hammer committed reversible error in failing to enumerate each of the medical records that he considered in formulating his mental health assessment. After all, in his independent analysis, the ALJ did allude to some such incidents and accorded less weight to the 2003 assessment, for example, because Mr. Shakespeare gave limited effort during that test. Ultimately, because the record offers substantial evidence from both examining and treating physicians upon which the ALJ could make an informed decision, further development of the record is not needed. See Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004) (citing Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (holding it improper for an ALJ to rely exclusively on reviewing physician opinions)). Somatoform is a mental impairment and Mr. Shakespeare did not list this or any other mental impairment on his application for benefits. As indicated earlier, the ALJ need not delve into claims that plaintiff failed to list in the benefits application. See Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993).

### F.  Residual Functional Capacity

Plaintiff argues that the ALJ failed to consider the combined effects of his alleged impairments in making the RFC. See 20 C.F.R. § 404.1523. The Commissioner argues that the ALJ more than adequately explained why the collective impairments do not prevent Mr. Shakespeare from working, be it past relevant work or otherwise.

The ALJ thoroughly reviewed Mr. Shakespeare's many alleged physical impairments (i.e., vertigo, tinnitus, headaches, vision difficulties, etc.). The ALJ further

reviewed the possibility of mental impairments (i.e., depression, somatoform disorder) even though Mr. Shakespeare never alleged such impairments as the basis for his benefits claim. In light of the record evidence on the whole and the credibility determination discussed above, the ALJ determined that Mr. Shakespeare could not perform work that involved climbing ladders/scaffolds, heights, or moving machinery. This RFC determination did not preclude Mr. Shakespeare from conducting past relevant work as a security guard, bagger, or landfill operator, however.

After reviewing Mr. Shakespeare's alleged physical and mental impairments, subjective allegations of pain, and daily activities, the ALJ found that Mr. Shakespeare can still perform past relevant work. "'To require a more elaborate articulation of the ALJ's thought processes would not be reasonable.'" Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (quoting Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)). Mr. Shakespeare offers a generalized otoneurology medicine article in support of his contention that the ALJ failed to consider all alleged impairments in combination. The Commissioner rightly pointed out that disability determinations must be grounded in acceptable medical evidence in the record, not generalities, however. See 20 C.F.R. § 404.1508. Thus, the ALJ did not fail to consider plaintiff's alleged impairments in combination.

The ALJ did not end the inquiry with past relevant work and, with the advice of a vocational expert, found that even in the event that Mr. Shakespeare could not return to such activities, certain other employment were available in the national economy (i.e., parking officer, office helper, housekeeping cleaner). The ALJ employed proper techniques in arriving at a fair and thorough RFC determination in this matter.

Upon the foregoing.

IT IS ORDERED that the determination of the ALJ is affirmed and this matter is dismissed.

July 26, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT